STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

|  |  |
|---|---|
| Abdullahi Ali,<br><br>                                      Plaintiff,<br><br>v.<br><br>HealthEx Corp., HealthEx Couriers LLC,<br>Joseph Montemarano, and Dustin Hoffman as<br>individuals,<br><br>                                      Defendants. | Case Type: Employment<br><br><br>**SUMMONS** |

### THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANTS:

1.      YOU ARE BEING SUED. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no Court file number on this Summons.

2.      YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS. You must give or mail to the person who signed this Summons a written response called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the persons who signed this Summons located at: see addresses below.

3.      YOU MUST RESPOND TO EACH CLAIM. The Answer is your written response to the Plaintiffs Complaint.  In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for In the Complaint, you must say so in your Answer.

4.      YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS. If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint If you do not want to contest the claims stated In the Complaint, you do not need to respond. A Default Judgment can then be entered against you for the relief requested in the Complaint.

5.      LEGAL ASSISTANCE. You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get

1

legal assistance. Even If you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6.      ALTERNATIVE DISPUTE RESOLUTION. The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: September 19, 2019                       SATRE LAW FIRM

                                                Eric D. Satre, MN Bar No. 183015
                                                Attorney for Plaintiffs
                                                US BANK CENTER
                                                101 Fifth Street East, Suite 2600
                                                Saint Paul, MN 55101
                                                Telephone: (651) 212-4919
                                                Facsimile: (651) 212-4203
                                                esatre@satrelaw.com
                                                admin@satrelaw.com

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

| | |
|---|---|
| Abdullahi Ali,<br><br>                                        Plaintiff,<br><br>v.<br><br>HealthEx Corp., HealthEx Couriers LLC,<br>Joseph Montemarano and Dustin Hoffman as<br>individuals,<br><br>                                        Defendants. | Case Type: Employment<br><br>**COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

Abdullahi Ali, Plaintiff above-named for his cause of action against Defendant states and alleges as follows:

## GENERAL ALLEGATIONS

1.      Abdullahi Ali, (hereinafter "Plaintiff") is married adult male father of four young children of East African origin, residing in the State of Minnesota.

2.      Defendant HealthEx Corp. (hereinafter "Company") is a New York company with a registered office for service at 3 Ellis DR, Syosset, New York, 11791 and a principal office at 35 Powerhouse Road, Roslyn Heights, New York, 11577.

3.      Defendant HealthEx Couriers LLC is a New York corporation that may be served with process at 35 Powerhouse Road, Roslyn Heights, New York, 11577.

4.      Defendant Joseph Montemarano (hereinafter "Montemarano") is an individual and Director of Operations for HealthEx Corp. who may be served with process at 35 Powerhouse Road, Roslyn Heights, New York, 11577.

1

5. Defendants principal place of business in Minnesota is 105 Old Highway 8 NW, Suite 2, New Brighton, MN 55112.

6. A business filing search for HealthEx Corp. and HealthEx Couriers LLC at the Office of The Minnesota Secretary of State yielded no results.

7. Defendants have a contract in Minnesota with Fairview Health Services.

8. Defendant Dustin Hoffman (hereinafter "Hoffman") is an adult male resident of Minnesota.

9. Hoffman was the regional manager for the Company in Minnesota throughout the relevant period.

10. Venue is proper in this case since the events giving rise to these claims primarily occurred in Ramsey County and Plaintiff resides in Minnesota.

11. The Company describes their services as *"a courier service that is dedicated exclusively to the healthcare community. We have taken one of the oldest services known to man, and updated it to satisfy the specific needs and demands of the medical community. We offer live dispatch 24 hours of every day, 365 days a year. We know that as patients' needs will continue to evolve and change, so must our services. This is our challenge, and our commitment to our customers. "*

12. During Plaintiff's employment with Defendants, he was engaged in interstate commerce and more specifically the delivery of medications.

13. During Plaintiff's employment with Defendants, the Company together with its other entities i.e., HealthEx Corp., HealthEx Couriers LLC, Keith W. Kearney as an individual and Dustin Hoffman were an enterprise engaged in commerce because they (1) had employees

2

engaged in commerce or in the production of goods for commerce or had employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by others and (2) had an annual gross volume of sales made or business done of at least $500,000 and they exercised control over the compensation practices at issue.

14.     Whenever it is alleged that Defendants committed any act or omission, it is meant that company's officers, directors, vice-principals, agents, servants or employees committed such act or omission and that, at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendants or was done in the routine and normal course and scope of employment of the company's officers, directors, vice-principals, agents, servants or employees.

15.     On or about May 27, 2017, Plaintiff was recruited by Defendants as a courier and employee based on his relationship with the Somali community of which he is a member.

16.     The Company relied upon Plaintiff's ability to recruit and translate as well as develop a pool of candidates to serve as couriers.

17.     At the time of his recruitment, Plaintiff was employed by Northland where his monthly compensation averaged between $4,800 and $5,000.

18.     Defendants failed to memorialize the terms of the agreement even though they were required to do so by Minnesota law (Minn. Stats. §181.55).

19.     Glen Drake promised Plaintiff that, if he left Northland, he would have a compensation package that would pay him between $80,000 and $90,000 per year inclusive of performance bonuses.

3

20.     As an additional incentive, Defendants offered Plaintiff employment as a courier was $140 daily salary. Plaintiff's primary responsibility was to pick up and deliver biological samples for Fairview while using his personal vehicle and covering all associated costs related to the logistics of being a courier for Defendants.

21.     For his position as dispatcher, Defendants' eventually paid Plaintiff and hourly rate of approximately $16.25 per hour.

22.     Plaintiff was also promised bonuses of $2,800 to be paid quarterly as additional incentive to leave his position with Northland.

23.     In his almost two years of service to the Company, Plaintiff did not receive any of the promised bonuses.

24.     Plaintiff's responsibilities did not meet the criteria to qualify for the FLSA executive or administrative exemptions.

25.     Defendants did not maintain time records and did not even have a time clock or computer-based time tracking program.

26.     Plaintiff worked 7 days per week on average over 10 hours per day and was on call to troubleshoot any issues that arose during his time off.

27.     Plaintiff did not receive uninterrupted lunch breaks throughout his employment with Defendants.

28.     Plaintiff was also offered bonuses based on his recruitment of additional couriers from the Somali community.

29.     Plaintiff never received the promised bonuses for his recruitment efforts.

30.     To avoid paying Plaintiff for all overtime hours worked, Defendants' asked Plaintiff to refer to himself as a Dispatch Manager. A title he shared with two other employees even though he did not act as a Manager.

31.     Plaintiff was required to use his personal cell phone and did not receive any subsidy from the Company even though the phone was being used for business.

32.     Plaintiff's similarly situated white coworkers received cell phones and plans provided and paid for by the Company.

33.     Defendants failed to provide driver training even though they proclaim that *"HealthEx will only contract couriers who have been trained to handle and transport medication and biological materials. The training must meet or exceed OSHA, HAZMAT, and HIPAA standards for the healthcare industry. We've made the investments needed to consistently provide a high level of professional service."*

34.     Defendants' claim on their website under the heading "Driver Selection" that *"All prospective drivers go through a screening process that includes a department of motor vehicles report, a social security verification, and a criminal background check. As a condition of contracting with HealthEx, drivers also agree to participate in random drug testing. In addition, although it may seem obvious and very simplistic, we try to find NICE people to make your deliveries. The value of training or experience can be lost if the individual does not come across as kind to your clients. We have not forgotten the importance of a smile and a good attitude in our effort to provide you with the best possible drivers for your deliveries."* Defendants' do not maintain the documents that support their contention in this section.

35.     Defendants also state on their website under the heading Driver Qualifications with the sub heading "OSHA" that *the United States Department of Labor Occupational Safety and Health Administration (OSHA) and the Department of Health & Human Services Centers For Disease Control and Prevention (CDC) have set up specific guidelines and standards for the handling of biological materials. Our drivers are qualified to uphold these standards both to ensure the proper handling and integrity of your specimens, medication, or equipment as well as for their own personal safety. This experience, as well as our use of equipment that meets OSHA's standards combine to provide our customers with reliable, OSHA compliant transportation.* During the relevant period, couriers drove their personal vehicles and were not required to attend any specialized training or ensure that their personal vehicles met the climate control and safety requirements set out by the bodies they reference.

36.     Defendants also required the use of their tracking equipment which was a handheld scanner.

37.     Defendants claim on their website under the heading of **"HIPAA"** *The Health Insurance Portability and Accountability Act (HIPAA) has had an enormous impact on the healthcare community. Patient confidentiality is a major concern to each and every one of our customers. As such, all patient information is handled with strict confidence and security in compliance with HIPAA guidelines.* Defendants did not conduct any training as to the requirements drivers needed to satisfy HIPPA.  Further many of drivers lacked the language skills to access the content to understand HIPPA regulations and requirements.

38.     Defendants required that Plaintiff and similarly situated coworkers comply with the following: *"All HealthEx couriers are in uniform and wearing a photo Identification badge as*

6

*dictated by your specific needs. Not only is this protocol mandatory at many facilities and practices, but it gives peace of mind to all patients, administrators, and medical staff that we encounter every day."* As a result, Plaintiff was presented as an employee of Health Ex when he acted as a courier.

39.     Defendants advertise and contract with their customers that drivers would be utilizing equipment that satisfies the following: ***Climate Control*** *"When it comes to medical transport, temperature control is often a factor. Whether the concern is keeping a specimen frozen or keeping medication refrigerated, HealthEx has the equipment to maintain the integrity of your deliveries."* The reality throughout the relevant period was that drivers used their personal vehicles in an 'as is' state and received no special equipment or training to ensure that they satisfied this essential requirement.

40.     Plaintiff informed his superiors at the Company that couriers had not received the training they proclaim on their website each courier has received.

41.     Further, some training for HIPPA, HAZMAT and OSHA requires certifications to be earned and continuing education on a cycle for compliance. Plaintiff informed the Company that they had not been meeting those requirements via email to the director of operations, Joseph Montemarano. Despite that good faith report, no action was taken aside from actions taken against Plaintiff.

42.     Defendants violated the FLSA by employing Plaintiff as a nonexempt employee "for a workweek longer than forty hours [but refusing to compensate him] for employment more than [forty] hours... at a rate not less than one and one-half times the regular rate at which [they are or were] employed." 29 U.S.C. § 207(a)(1). He did not meet the requirements of the administrative

7

exemption because he did not have independent discretion on matters of significance within the organization and he was often micro-managed by his Manager.

43. Defendants violated the FLSA by failing to maintain accurate time and pay records for Plaintiff, as a nonexempt employee as required by 29 U.S.C. § 211(c) and 29 C.F.R. pt. 516.

44. Defendants knew or should have known that their scheme for payment was illegal and that it improperly categorized Plaintiff as salaried employee even though he did not qualify for exempt status under the Fair Labor Standards Act.

45. Plaintiff was misclassified as an exempt employee, so Defendant could avoid overtime rules. In addition, Defendant intentionally failed to track Plaintiff's time as required by the FLSA. Furthermore, throughout Plaintiff's employment with Defendant, his agreed upon rate of pay was consistently shorted.

46. Defendants promulgated employment compensation policies that Plaintiff was forced to comply with. In other words, Defendants, through its management, (1) possessed the authority to hire or fire Plaintiff; (2) supervised or controlled Plaintiff's schedule and/or conditions of employment; and (3) determined Plaintiff's compensation which was inaccurate.

47. Plaintiff never received compensation for any overtime hours worked. Defendants did not pay Plaintiff overtime "at a rate not less than one and one-half times the regular rate at which he [was] employed." 29 U.S.C. § 207(a)(1).

48. Instead, Defendants paid Plaintiff a flat sum for each day's work regardless of the number of hours he worked in a workweek.

49. Defendants knew or showed a reckless disregard for whether its pay practices violated the FLSA.

50.     Defendants are liable to Plaintiff for his unpaid overtime wages, liquidated damages and attorney's fees and costs pursuant to 29 U.S.C. § 216(b).

51.     Plaintiff never had a scheduled or uninterrupted lunch period at any point during his employment with Defendant.

52.     As a result of Plaintiff's whistleblowing [for failure to pay, wage and hour, illegal drug use] complaint and discrimination complaints was terminated for false reasons.

53.     After Plaintiff's termination, he made multiple attempts at obtaining payment of all outstanding earned wages owed to him by Defendants and received no reply.

54.     Plaintiff contacted the Company's representative Nina Lebron.  She responded to Plaintiff's demands for payment and repeated complaints regarding illegal activities at the Minnesota office with threats of litigation against Plaintiff.

55.     Plaintiff has not received payment, or any other communication following his written demand for payment from Defendants.

56.     Plaintiff was subjected to racial discrimination by similarly-situated coworker Kris Tillman [who was in a relationship with Dustin Hoffman] and she even called him "Nigger".

57.     In addition, Kris Tillman threatened to call the police on Plaintiff due to a workplace dispute and directed a discriminatory comment based on his national origin when she stated "I will have you taken out of here. You don't even belong in this country."

58.     On numerous occasions, Plaintiff had complained to the company that Tillman and Hoffman were illegally using marijuana in the company offices.

59.     Further, Tillman and Hoffman were in engaged in a personal relationship and started to use a Company office for the purpose of housing Tillman's children instead of a daycare.

9

60.     Plaintiff complained about these activities to the Company's Operations Director Joseph Montemarano.

61.     Plaintiff was also subjected to discriminatory behaviors by his immediate supervisor Hoffman.  Hoffman called Plaintiff a Nigger on no less than two occasions.

62.     One disagreement which precipitated Hoffman calling Plaintiff a Nigger was due to Plaintiff's refusal to take on an additional driver route that Hoffman could not get covered, but expected Plaintiff to cover even though that was not part of his job duties and similarly situated white employees did not have to perform the double duty.

63.     The covering of an additional route was not within the scope of Plaintiff's responsibilities as an employee [or even a misclassified independent contractor] with the Company.

### COUNT I
### FALSE STATEMENTS AS INDUCEMENT TO ENTERING EMPLOYMENT
### Violation of Minnesota Statutes § 181.64
### (Against the corporate Defendants)

Plaintiff realleges and incorporates herein by reference the allegations in the proceeding paragraphs.

64.     The Company induced Plaintiff into accepting employment in early June of 2017, Plaintiff met with Glen Drake to discuss the employment opportunity.

65.     At the above referenced meeting, Plaintiff was verbally offered the position and was given a start date in the second week of June 2017 with assurances that his compensation package that would pay him between $80,000 and $90,000 per year inclusive of performance bonuses.

66.     The actual wage paid by Defendant once Plaintiff's employment began was approximately $16.25 per hour.

67.     At the time of his resignation from Northland, Plaintiff averaged between $4,800 and $5,000 per month.

68.     Plaintiff relied on the false statements to move his employment.

69.     As a direct and proximate result of the acts alleged above, Plaintiff has suffered and continues to suffer damages including, but not limited to economic loss and emotional distress.

### COUNT II
### VIOLATION OF MINNESOTA STATUTES §181.932
#### (Against the Corporate Defendants)

70.     Plaintiff made many reports of illegal conduct throughout his employment which culminated in a final good faith report of illegal conduct reported to defendants through Dustin Hoffman and Nina Lebron that he had not been paid all wages and bonuses.

71.     Plaintiff communicated that he had not been paid all of his outstanding wages.

72.     As a result of Plaintiff's complaint, he was terminated by Dustin Hoffman.

73.     The multiple internal reports including, wage theft, failure to pay, drug use in the workplace, failure to pay independent contractors, failure to comply with HIPPA, HAZMAT and OSHA, racial and national origin discrimination that  Plaintiff made and described herein, are protected conduct the Minnesota whistleblower statute intended to protect.

74.     Defendants retaliated against Plaintiff by terminating his employment and said retaliation is in violation of Minnesota Statutes, section 181.932 et seq. for Plaintiff engaging in protected conduct described herein.

75.     As a direct and proximate result of the retaliation described herein Plaintiff has suffered from severe emotional distress, loss of fringe benefits, and loss of wages in the past and in the future.

## COUNT III
### VIOLATION OF MINNESOTA STATUTES §181.13/14
#### Failure to Pay
(Against the Corporate Defendants)

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

76.     Following his termination, Plaintiff requested in writing that Defendants pay the wages due and owing to him.

77.     The corporate Defendants have refused to pay Plaintiff his full pay.

78.     The corporate Defendants' failure to pay Plaintiff the wages owed is a violation of Minnesota Statute section 181.13, subjecting the employer to penalties as provided under the statute.

79.     Plaintiff is entitled to costs and disbursements, and attorney's fees as provided under Minnesota Statute section 181.171 et seq.

80.     Therefore, Plaintiff has been damaged in the amount of his unpaid wages as well as the 15-day daily wage penalty and his reasonable attorney fees and costs.

## COUNT IV
#### Promissory Estoppel
(Against the Corporate Defendants)

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

81.     Defendants promised Plaintiff was that he would be paid at least $70,000 per year if he accepted employment and left his prior employment.

82.     Plaintiff was also promised bonuses for additional work performed recruiting other members of the Somali community, translating and acting as a liaison in the amount of $2,800 every three months.

83.     The only reason Plaintiff agreed to perform the additional work and overtime was the promise of the additional bonus pay.

84.     Defendants defrauded Plaintiff by promising bonuses for additional work including overtime and never making payment even when requested in person and then in the form of a written demand.

85.     Defendants have benefited from the services of Plaintiff and it is reasonable to enforce the promises made by Defendants to avoid an injustice.

86      Plaintiff demands damages and consequential damages for this cause of action as more fully set forth below.

87.     The promise must be enforced to avoid an injustice to the promisee. See *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992).

## COUNT V
### Breach of Contract
(Against the Corporate Defendants)

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

88.     Plaintiff accepted employment under the terms of the offers referred to herein. However, Defendants repeatedly failed to even honor those terms.

13

89.     Defendants failed to even pay Plaintiff the $70,000 he was promised in addition to the bonuses he was promised for translation services as described at paragraph 82 herein. In addition, Defendants simply refused to pay for days that had been worked.

90.     Plaintiff accepted the offers, and he performed the additional work requested as referred to in the preceding paragraphs.

91.     However, Defendants refused to honor their promises for the additional work and often even failed to pay anything [even the legally required overtime] for the additional work.

92.     As a direct and proximate result of said breaches, Plaintiff suffered loss of income.

## COUNT VI
### Unjust Enrichment
(Against the Corporate Defendants)

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

93.     Defendants have received a benefit of money because of its promises to pay Plaintiff and then its willful disregard of those promises. Defendants did so for the joint purpose of depriving Plaintiff of the full and correct amount of compensation owed to him pursuant to the agreement and to keep the money under no claim of right.

94.     Defendants have received a benefit of money they received illegally or unjustly when they committed the theft of wages, they assured Plaintiff they would pay.

95.     Defendants have knowingly and without legal justification accepted such the benefit of Plaintiff's work and the compensation due for that work, thereby depriving Plaintiff of such benefits.

14

96.     Defendants have retained such benefits under the circumstances that would make it inequitable and an unjust enrichment for Defendant to retain those benefits.

97.     As a direct and proximate result of Defendants' unjust enrichment, Plaintiff has suffered damages, including, but not limited to, lost wages.

### COUNT VII
### STATE AND FEDERAL FAIR LABOR STANDARDS ACT
**29  USC § 201 et seq., and Minn. Stat. §177.25, subd. 1.**
(Against the Corporate and Individual Defendants)

Plaintiff re-alleges and incorporates herein by reference the allegations in the proceeding paragraphs.

98.     At all times relevant, Defendants have been, and continue to be an "employer" (any person acting directly or indirectly in the interest of an employer in relation to an employee) as defined by the FLSA and engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203 (hereinafter "FLSA").   At all relevant times, upon information and belief, Defendants have had gross operating revenues in excess of $500,000.00.

99.     The FLSA requires each covered employer, such as Defendants herein, to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed more than forty hours per work week. Likewise, the Minnesota Fair Labor Standards Act requires each covered employer, such as Defendant herein, to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed more than forty-eight hours per work week.

100.    Plaintiff is entitled to be paid overtime compensation for all hours worked more than forty under federal law and forty-eight under state law.

101.    Defendants, pursuant to their policies and practices, including improperly categorizing all delivery drivers as independent contractors with no basis for doing so, and also failed and refused to pay overtime and overtime premiums to Plaintiff for all hours worked in excess of forty hours.

102.    Plaintiff was not provided the promised one hour per day for lunch nor did he receive the minimum of 30 minutes for an uninterrupted lunch period for an 8-hour workday.

103.    Defendant rotated Plaintiff's alleged exemption status, at various times claiming that he paid a salary and at other times claiming that he was paid hourly.

104.    By failing to provide Plaintiff with lawful overtime compensation, and firing him when he complained about the illegal pay practices Defendants have violated the FLSA, 29 U.S.C. § 201 et seq. and the Minnesota Fair Labor Standards Act.

105.    The foregoing conduct, as alleged herein, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

106.    Among other remedies, Plaintiff seeks damages in the amount of his respective lost wages past and future as well as unpaid overtime and regular time compensation, liquidated damages as provided by the MFLSA and the FLSA § 216(b), interest, and such other legal and equitable relief as the Court deems proper and just.

107.    Plaintiff seeks recovery of attorneys' fees and costs to be paid by Defendants, as provided by the FLSA and pursuant to the Minnesota FLSA.

108.    As a direct and proximate result of these violations, Plaintiff suffered and continues to suffer from the unpaid wages he is entitled to as a matter of law.

### COUNT VIII
### Violation of 29 U.S.C. § 211(c)

(Against the Corporate Defendants)

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

109.   The FLSA requires employers to keep accurate records of hours worked by and wages paid to nonexempt employees. 29 U.S.C. § 211(c); 29 C.F.R. pt. 516.

110.   In addition to the pay violations of the FLSA described above, Defendants also failed to keep proper time and pay records as required by the FLSA.

111.   As a result, Plaintiff seeks damages for those violations.

### COUNT IX
### Violation of 42 USC §1981 and the MHRA Minn. Stats, §363A
### National Origin, Racial, and Reprisal Discrimination
(Discrimination against the Corporate Defendants,
MHRA Reprisal against all defendants)

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

112.   Plaintiff and similarly situated black co-workers of African origin and were and continue to be subjected to disparate treatment based on their national origin.

113.   Plaintiff was treated differently than similarly situated white co-workers and he was expected to be on call when his white coworkers were not required to work nearly as many hours for the same pay. He was also subject to a pay scheme and falsely induced to accept additional and overtime work as well as the promise of additional pay communicated as a bonus.

114.   Plaintiff communicated with several African origin co-workers and determined that the payment scheme was being applied to them as a group.

17

115.   Defendant Dustin Hoffman and Tillman made directly discriminatory comments which were part of the discriminatory practices. When Plaintiff complained about the discriminatory practices he was subjected to retaliation/reprisal up to and including termination.

116.   As a direct and proximate result violations Plaintiff suffered and continues to suffer damages including but not limited to lost wages as well as emotional distress and suffering past and future.

**COUNT X**
**VIOLATION OF MINN. STATS. §§177.30 AND 181.032**
**FAILURE TO KEEP RECORDS AND PROVIDE AN EARNINGS STATEMENT**
**(Against the Corporate Defendants)**

Plaintiff realleges and incorporates herein by reference the allegations in the proceeding paragraphs.

117.   Throughout the relevant time-period, Defendant was an employer within the meaning of Minnesota Statute section 177.23, Subdivision 6, and subject to the requirements of Minnesota Statute section 177.30, Subdivision 1, which provides in pertinent part:

118.   Every employer subject to sections 177.21 to 177.35 must make and keep a record of:

- The name, address, and occupation of each employee;
- The rate of pay per hour, and the amount paid each pay period to each employee; and
- The hours worked each day and each workweek by the employee…

119.   Plaintiff is entitled to the protections of Minnesota Statute section 177.30, Subdivision 1 and §181.032.

120.   Defendant has violated the above provisions by failing to keep records of Plaintiff's rate of pay and hours worked each day and workweek or to provide them to her.

121.   Defendant is liable to Plaintiff for compensatory and liquidated damages, a civil penalty for each violation, plus costs, disbursements, witness and attorney's fees, pursuant to Minn. Stat. §177.27, Subdivision 10 in an aggregate sum in excess $50,000.00.

## RELIEF

**WHEREFORE,** Plaintiff respectfully asks the Court to award judgment against Defendant as follows:

1. Compensatory and special damages to be paid by all Defendants to Plaintiff in an amount in excess of Fifty Thousand and No/100 ($50,000.00) dollars.

2. Damages under Minnesota statutes 181.171 for fees and costs and 181.13 for the 15-day daily wage penalty.

3. Any and all damages under Minnesota Statutes section 181.935 including any and all damages recoverable at law as well as costs and disbursements, including reasonable attorney's fees, and may receive such injunctive and other equitable relief as determined by the court.

4. All damages sustained in consequence of the false or deceptive representations, or false pretenses used to induce the person to enter into or change a place of employment, in addition to all such actual damages such person may have sustained, shall have the right to recover such reasonable attorney fees as the court shall fix, to be taxed as costs in any judgment recovered.

5. Against all Defendants, for all statutory damages in the amount of Plaintiff's unpaid overtime compensation, including but not limited to liquidated damages as provided by the FLSA, 29 U.S.C. § 216(b), and the Minnesota FLSA interest, and such other legal and equitable relief as the Court deems proper and just.

6. Against all Defendants, for all statutory damages, including attorneys' fees and costs to be paid by Defendant, as provided by the FLSA, 29 U.S.C. § 216(b) and the Minnesota FLSA.

7. Past and future wage loss and emotional distress and suffering losses as well as civil penalties and punitive damages and treble damages with attorney fees and costs under the Minnesota Human Rights Act and 42 USC §1981.

8. Reasonable attorney's fees on all applicable counts.

9. Costs and disbursements, and pre and post-judgment interest.

19

10. For such other relief as this Court deems just and equitable.

Dated: <u>September 19, 2019</u>

**SATRE LAW FIRM**

Eric D. Satre, MN Bar No. 183015
Attorney for Plaintiff
US Bank Center
101 Fifth Street East, Suite 2600
Saint Paul, MN 55101
Telephone: (651) 212-4919
Facsimile:  (651) 212-4203
esatre@satrelaw.com
admin@satrelaw.com

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. §549.211 to the party against whom the allegations in this pleading are asserted.

Dated: <u>September 19, 2019</u>

Eric D. Satre (#183015)